IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JUDY D. | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 17 C 8994 |
| v. | ) |
| | ) Magistrate Judge Sidney I. Schenkier |
| ANDREW SAUL, | ) |
| Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, Judy D., moves for summary judgment seeking reversal and remand of the final decision of defendant, the Commissioner of Social Security ("Commissioner"), denying her application for disability insurance benefits ("DIB") (doc. # 15; doc. # 16: Pl.'s Summ. J. Mem.). The Commissioner has filed a response asking us to affirm his decision (doc. # 23: Def.'s Summ. J. Resp.), and Ms. D. has filed a reply (doc. # 24: Pl's Reply). For the following reasons, we grant Ms. D.'s motion and remand the case for further proceedings.

### I.

On February 20, 2014, Ms. D. applied for DIB, alleging disability due to neuropathy and multiple sclerosis ("MS") and a disability onset date of October 31, 2006 (R. 84, 90, 104).[3] Her date last insured ("DLI") was December 31, 2011 (R. 18, 90), so the relevant time period for

---

[1] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019. https://www.ssa.gov/agency/commissioner.html (last visited Aug. 9, 2019). Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Commissioner Saul as the named defendant.

[2] On February 13, 2018, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 8).

[3] Ms. D. filed a previous DIB claim in October 2012, which was denied in March 2013 (R. 40-41, 85). The record does not reflect which disabilities Ms. D. alleged in the earlier application.

evaluating her DIB claim is October 31, 2006 through December 31, 2011 (the "Relevant Period"). *See McHenry v. Berryhill*, 911 F.3d 866, 869 (7th Cir. 2018) (explaining that a claimant must establish that she became disabled before the DLI to qualify for DIB).

The Social Security Administration ("SSA") denied Ms. D.'s application at the initial and reconsideration stages of review, after which Ms. D. requested a hearing before an Administrative Law Judge ("ALJ") (R. 90-91, 104-07, 112-17). On August 24, 2016, the ALJ held a hearing at which Ms. D. and a vocational expert ("VE") testified (R. 35-83). On October 26, 2016, the ALJ issued a decision denying Ms. D.'s DIB claim (R. 15-34). The Appeals Council denied Ms. D.'s request for review, making the ALJ's decision the final word of the Commissioner (R. 1-5). *See Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); 20 C.F.R. § 404.981.

## II.

Ms. D. was born on January 19, 1961 (R. 172). She worked as a patient care technician in a hospital from 1995 until 2006 (R. 209). She reported that she stopped working because of her conditions on October 31, 2006 (R. 208).[4] Although the ALJ ultimately found that Ms. D. had both mental and physical impairments that were medically determinable, we focus on evidence that touches upon Ms. D.'s mental impairments because the ALJ's treatment of those impairments forms the basis of our decision in this case.

In January 2009, Ms. D. visited Steven Chandler, D.O., complaining of bilateral hip and leg pain that had begun four years earlier (R. 300). At the time, Ms. D. exhibited no psychological symptoms; specifically, "[n]o anxiety, no depression, and no sleep disturbances" (R. 301).

---

[4] Ms. D.'s earnings records, however, indicate that she worked in 2007 and 2010 (R. 20, 182, 184). Ms. D. also reported that she worked for one month in 2009 and performed 24-hour in-home care one day per week from 2010 to 2011 (R. 265).

2

On December 14, 2009, Ms. D. presented to Advocate Christ Medical Center after she attempted suicide by sitting in a bathtub filled with water while holding a plugged-in hair dryer (R. 282-83). Intake notes from Mohammad Razzaque, M.D., note that Ms. D. had a history of bipolar depression and that she had been drinking heavily on the weekends because she suspected that her husband was cheating on her (R. 282).[5] Ms. D. was admitted to the psychiatric floor and was "to continue psychotropic medication"; the notes, however, do not identify the specific psychotropic medication at issue (R. 282-83).[6] Although the ALJ indicated that this hospitalization lasted less than one week (R. 22), we have not seen anything in the record reflecting when Ms. D. was discharged.

Less than two months later, on February 5, 2010, paramedics took Ms. D. to the emergency room at Little Company of Mary Hospital for alcohol intoxication (R. 655-63). She reported that she was drinking so heavily because her husband was having an affair (R. 657). Ms. D. was discharged the same night (R. 662).

On March 15, 2010, Ms. D. voluntarily admitted herself to the hospital after another suicide attempt; while intoxicated, she took 40 aspirin and 10 Pepcid and then sat in her car in a closed garage with the car running (R. 667). Ms. D. stated that she had been depressed for several weeks regarding her husband's affair (*Id.*). The medical notes state that Ms. D. had "no formal psychiatric treatment" and "[n]o previous psychiatric hospitalization" and that, although she was previously admitted to the hospital for alcohol intoxication, "she minimize[d] any suicide attempts around that time of admission" (R. 667, 669). Ms. D. was diagnosed with major depressive disorder, status

---

[5] On an Adult Disability Report form, Ms. D. reported that she visited Advocate Christ Medical Center in 2005 and 2007 for treatment or evaluation of "depression, PTSD, bipolar" (R. 218). The record does not contain any documentation for these visits.

[6] Moreover, Dr. Razzaque's notes list Ms. D.'s medications at the time of admission as "Aspirin, folic acid, magnesium, multivitamin, thiamine" (R. 282), none of which are psychotropic medications.

3

post-suicide attempt, and was treated with individual psychotherapy and medication (*Id.*). She was discharged from the hospital on March 21, 2010 (R. 667).

Ms. D. saw Vijay Bajaj, M.D., from 2006 to November 2010 (R. 212, 288-90, 735). Sometime during this time period (the depression screening form at issue is undated), Dr. Bajaj screened Ms. D. for depression (R. 297). A diagnosis of major depression requires the presence of at least five out of the nine criteria listed on the form (*Id.*). Dr. Bajaj assessed Ms. D. as having three out of nine criteria: significant weight loss or weight gain, insomnia/hypersomnia, and psychomotor agitation/retardation (*Id.*).

### III.

In denying Ms. D.'s DIB claim, the ALJ followed the familiar five-step process for assessing disability. *See* 20 C.F.R. § 404.1520(a). At Step One, the ALJ determined that Ms. D. had not engaged in substantial gainful activity during the Relevant Period (R. 20). At Step Two, the ALJ determined that Ms. D. suffered from the following severe impairments during the Relevant Period: chronic pain, degenerative disc disease, and a history of alcohol abuse (*Id.*). At this step, the ALJ also concluded that although Ms. D. reported an MS diagnosis, she had not established that it was a medically determinable impairment (R. 21). The ALJ further found that Ms. D. suffered from a medically determinable affective disorder,[7] but that this impairment was not severe (*Id.*). In making this finding, the ALJ evaluated Ms. D.'s degree of limitation in four broad functional areas (R. 21-22). The ALJ determined that Ms. D. experienced (1) no limitation in activities of daily living; (2) no limitation in social functioning; (3) mild limitation in

---

[7] When the ALJ issued his decision in November 2016 (R. 28), the applicable regulations defined "affective disorder" as a mental disorder "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04 (Sept. 29, 2016 to Jan. 16, 2017).

4

concentration, persistence, or pace; and (4) no episodes of extended decompensation (R. 22).[8] At Step Three, the ALJ concluded that none of Ms. D.'s impairments, individually or in combination, met or equaled a listed impairment (R. 22-23).

Between Steps Three and Four, the ALJ evaluated Ms. D.'s residual functional capacity ("RFC"). *See* 20 C.F.R. § 404.1520(a)(4). The ALJ concluded that during the Relevant Period, Ms. D. retained the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) with certain exceptions or qualifications (R. 23). Specifically, Ms. D. could lift and/or carry up to 20 pounds occasionally and 10 pounds frequently; she had no limitation in the total amount of time she was able to sit, stand, or walk throughout an eight-hour workday; and she needed to alternate her position between sitting, standing, and walking for no more than five minutes out of every half hour, although she would not need to be off task while doing so (*Id.*). At Step Four, the ALJ found that Ms. D. was unable to perform any past relevant work during the Relevant Period (R. 27). At Step Five, however, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that Ms. D. could have performed during the Relevant Period, such as cashier II (R. 27-28). Thus, the ALJ determined that Ms. D. was not disabled (R. 28).

### IV.

Courts review ALJ decisions deferentially to determine if they apply the correct legal standard and are supported by "substantial evidence," which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017) (internal citations and quotations omitted). To satisfy the "substantial

---

[8] At the time of the ALJ's decision, these four areas constituted the "paragraph B" criteria (R. 21-22). *See Schmidt v. Astrue*, 496 F.3d 833, 844 n.4 (7th Cir. 2007); 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00C (Sept. 29, 2016 to Jan. 16, 2017). Those criteria have since been modified to address (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed Reg. 66138-01, 2016 WL 5341732, at *66161, *66164 (Sept. 26, 2016); *id.* at *66138 (specifying that revisions became effective Jan. 17, 2017); *see* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00E (Mar. 14, 2018).

5

evidence" standard, "the ALJ must build an accurate and logical bridge from the evidence to her conclusion." *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) (internal citations and quotations omitted). "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the [ALJ] by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018).

Ms. D. argues that we should reverse and remand the ALJ's decision because (1) the ALJ did not support his RFC assessment with substantial evidence; (2) the ALJ failed to explain why he did not include Ms. D.'s mild mental impairments in her RFC; and (3) the ALJ improperly assessed Ms. D.'s subjective allegations (Pl.'s Summ. J. Mem., at 4-15). We agree that the ALJ did not adequately explain why he did not include any RFC restrictions to account for Ms. D.'s mild mental limitation. Because we find remand necessary on this basis, we do not reach Ms. D.'s additional arguments for remand.

"The RFC is the maximum that a claimant can still do despite [her] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe[.]" *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). "This includes *any* deficiencies the claimant may have in concentration, persistence, or pace." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014) (emphasis added); *Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019) ("[T]he RFC . . . must incorporate the 'totality of a claimant's limitations,' including any 'deficiencies of concentration, persistence and pace'") (quoting *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010)). "A failure to fully consider the impact of non-severe impairments requires reversal." *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010).

Here, the ALJ found at Step Two that Ms. D.'s affective disorder was a non-severe medically determinable impairment that nonetheless caused mild limitation in her concentration, persistence, or pace ("CPP") (R. 21-22).[9] Despite this finding, the ALJ did not account for this limitation by including any non-exertional or mental restrictions in Ms. D.'s RFC (R. 23). Nor did the ALJ explain why he omitted any such restrictions (R. 23-27).

This was error. Although a mild "limitation in an area of mental functioning does not necessarily prevent an individual from securing gainful employment, the ALJ must still affirmatively evaluate the effect" of that limitation on the claimant's RFC. *Simon-Leveque v. Colvin*, 229 F. Supp. 3d 778, 787 (N.D. Ill. 2017) (internal citation and emphases omitted). If the ALJ believed that Ms. D.'s mild limitation in CPP "did not merit a non-exertional limitation in the RFC, he was obligated to explain that conclusion so that we can follow the basis of his reasoning." *Muzzarelli v. Astrue*, No. 10 C 7570, 2011 WL 5873793, at *23 (N.D. Ill. Nov. 18, 2011); *accord McCulley v. Berryhill*, No. 13 C 6031, 2019 WL 1292982, at *6 (N.D. Ill. Mar. 20, 2019) ("Although [the claimant's] mild limitation may not have required accommodation, as the Commissioner argues, the ALJ was at least required to explain why that is the case"). The ALJ did not do so here.

Moreover, we are not persuaded by the Commissioner's assertion that the ALJ satisfied this requirement by "consider[ing] the sparse record evidence regarding [Ms. D.'s] mental impairments and functioning both at step three (Tr. 21-22) and in the narrative explanation for the RFC finding (Tr. 24, 25, 26)" (Def.'s Summ. J. Resp., at 9-10). *First*, although the ALJ evaluated

---

[9] In January 2017, after the ALJ issued his decision, the applicable regulations were updated to define a "mild" limitation as one where an individual's ability to function "independently, appropriately, effectively, and on a sustained basis is slightly limited." 81 Fed Reg. 66138-01, at *66161, *66164; *id.* at *66138 (specifying that revisions became effective Jan. 17, 2017); *see* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00F(2)(b) (Mar. 14, 2018). This new definition, however, was "consistent with how [the SSA's] adjudicators have understood and used [that word] in [the SSA's] program" and, therefore, it did "not represent a departure from prior policy." 81 Fed Reg. 66138-01, at *66147.

Ms. D.'s mental limitations at Step Two, this evaluation "cannot stand in for an RFC determination." *Iora P. v. Berryhill*, No. 18 C 3640, 2019 WL 1112272, at *3 (N.D. Ill. Mar. 11, 2019). As SSR 96-8p explains, "the limitations identified in the 'paragraph B' . . . criteria are not an RFC assessment;" instead, a mental RFC assessment "requires a more detailed assessment by itemizing various functions contained in the broad categories found in" paragraph B. SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996). Indeed, the ALJ expressly recognized that the limitations he "identified in the 'paragraph B' criteria are not a residual functional capacity assessment" (R. 22).

It also was not enough for the ALJ to state that his RFC assessment "reflect[ed] the degree of limitation I have found in the 'paragraph B' mental function analysis" (R. 22). "Courts have remanded cases where an ALJ relied on" similar language "because it fails to clarify the degree to which the RFC expresses the functional limitations found" as part of the Step Two analysis. *Muzzarelli*, 2011 WL 5873793, at *23; *accord Iora P.*, 2019 WL 1112272, at *4. As we explained in *Muzzarelli*:

> [The ALJ] could have intended this [language] to mean that the RFC was designed to incorporate the mild impairments identified at Step 2, even though they were not specifically mentioned in the RFC. He could also have meant that he considered the Step 2 limitations as part of the RFC analysis but found them to be too mild to warrant additional non-exertional restrictions.

2011 WL 5873793, at *23 (internal footnote omitted). Or perhaps the language at issue is mere boilerplate that the ALJ uses to conclude *any* Step Two evaluation addressing a claimant's mental impairments or limitations. Without more of an explanation as to how Ms. D.'s mental limitations factor into her RFC (if at all), we cannot "trace the ALJ's path of reasoning." *See Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000).

*Second*, our review of the ALJ's narrative RFC explanation does not reveal any discussion of Ms. D.'s mild limitation in CPP or, for that matter, any substantive discussion of whether or how Ms. D.'s non-severe affective disorder more generally impacts her RFC. *See Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019) (an ALJ must "consider the limitations imposed by all impairments, severe and non-severe"). The Commissioner's citation to three pages of the ALJ's decision without any further explanation does nothing to help indicate where exactly this discussion purportedly took place (Def.'s Summ. J. Resp., at 10). If such a discussion existed—which our own review indicates was not the case—the Commissioner should have more specifically referred us to the portions of the ALJ's decision containing that discussion. *Cf. Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 898 (7th Cir. 2018) ("[J]udges are not like pigs, hunting for truffles buried in the record") (internal quotations and alteration omitted).

The Commissioner also asserts that Ms. D. has not explained "what specific restrictions the ALJ should have included or what evidence proved she required mental restrictions," and he points out that Ms. D. does not identify any medical opinions or other evidence reflecting that she had any work-related mental restrictions during the Relevant Period (Def.'s Summ. J. Resp., at 9-10). This argument misses the point. On this record, the error is one of articulation—or, more accurately, a lack thereof. The ALJ failed to explain why Ms. D.'s mild limitation in CPP did not need to be addressed in the RFC. It may be that, on remand, the ALJ will conclude that this limitation did not result in Ms. D. having non-exertional or mental restrictions during the Relevant Period or that Ms. D. could have performed other work even with any resulting restrictions.

But our task is not to reevaluate the facts or reweigh the evidence to determine whether Ms. D. is or is not disabled. *Stephens*, 888 F.3d at 327; *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992). Rather, our task is to determine whether the ALJ built "an

accurate and logical bridge from the evidence to [his] conclusion." *See Spicher*, 898 F.3d at 757 (internal citations and quotations omitted); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[W]e cannot uphold a decision by an administrative agency . . . if, while there is enough evidence in the record to support the decision, the reasons given by the [ALJ] do not build an accurate and logical bridge between the evidence and the result"). Here, the ALJ expressly found that Ms. D. suffered a mild limitation in CPP. Once he made this finding, he was required to discuss how or why this limitation factored (or did not factor) into his RFC assessment. The ALJ failed to build this bridge, and this failure requires remand. *See, e.g., McCulley*, 2019 WL 1292982, at *5-6 (the ALJ's failure to discuss and incorporate a mild limitation in CPP into "his RFC analysis and to determine what impact it had on [the claimant's] ability to perform her previous relevant work is grounds for remand"); *Iora P.*, 2019 WL 1112272, at *3-5 (the ALJ's failure to address the claimant's mild mental limitations in the RFC assessment or corresponding explanation required remand); *Hearan v. Berryhill*, No. 17 C 0542, 2018 WL 3352657, at *3 (N.D. Ill. July 9, 2018) (the ALJ's failure to factor mild limitations in activities of daily living, social functioning, and CPP into the RFC required remand).

On remand, the ALJ should reevaluate Ms. D.'s RFC, considering all the evidence of the record, including her severe and non-severe limitations, and he should explain the basis of his findings in accordance with applicable regulations and rulings.[10] With the assistance of a VE, the ALJ should determine whether Ms. D. could perform her past relevant work during the Relevant

---

[10] We note that the ALJ determined that Ms. D.'s chronic pain was a severe impairment (R. 20). The ALJ should consider whether Ms. D.'s severe pain impacts her ability to concentrate, persist, maintain pace, or perform other mental functions. *See Martinez v. Astrue*, 630 F.3d 693, 697-98 (7th Cir. 2011) (faulting the ALJ for not considering the interaction of the claimant's physical and mental problems because "[e]ven if each problem assessed separately were less serious than the evidence indicates, the combination of them might well be totally disabling"); SSR 03-2p, 2003 WL 22399117, at *5 (Oct. 20, 2003) (noting that chronic pain "may affect an individual's ability to maintain attention and concentration, as well as adversely affect his or her cognition, mood, and behavior, and may even reduce motor reaction times").

Period and, if not, if there were jobs that existed in significant numbers that Ms. D. could have performed. To do so, the ALJ "must ensure that the VE is apprised fully of the claimant's limitations," and "[t]he best way to do that is by including the specific limitations—like CPP—in the hypothetical." *Crump v. Saul*, --- F.3d ----, 2019 WL 3451276, at *3 (7th Cir. July 31, 2019) (internal quotations omitted).

## CONCLUSION

For the foregoing reasons, we grant Judy D.'s motion for summary judgment (doc. # 15) and remand the case for further proceedings consistent with this opinion. The case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATED: August 13, 2019